IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA

Roanoke Division

FILED IN OPEN COURT
DATE 12-10-14
BY Susan Moody
DEPUTY CLERK
Roanoke DIVISION, W.D of VA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | No. 7:14-cr-75-01 |
| ) | |
| KEVIN C. MOORE, ) | The Hon. Glen E. Conrad |
| ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

The United States and the defendant, KEVIN C. MOORE, stipulate that the allegations in the Information and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence that:

1. Beginning no later than in or around November 2009 and continuing through in or around October 2014, the defendant was a police officer employed by the City of Salem, Virginia, and a federally deputized member of a United States Drug Enforcement Administration task force. The mission of the Drug Enforcement Administration is to enforce the controlled substances laws and regulations of the United States and bring to the criminal and civil justice system of the United States, or any other competent jurisdiction, those organizations and principal members of organizations, involved in the growing, manufacture, or distribution of controlled substances appearing in or destined for illicit traffic in the United States.

2. As a Drug Enforcement Administration Task Force Officer ("DEA-TFO") during this period of time, the defendant was authorized to perform federal law enforcement functions.

Page 1 of 12

These functions included interacting with cooperating witnesses in ongoing federal law enforcement investigations and providing information and recommendations to federal prosecutors in the Western District of Virginia.

3. Beginning on or about February 13, 2009, the defendant, in his capacity as a City of Salem police officer, met on multiple occasions and communicated via cellular telephone calls and text messages with a female cooperating witness (hereinafter "CW-1") who was assisting an ongoing joint federal and state criminal investigation into heroin distribution in the Roanoke, Virginia, area. Following CW-1's testimony before a federal grand jury in March 2009, the defendant contacted CW-1 by telephone and falsely informed her that he had convinced the federal prosecutor and federal agents responsible for the investigation not to file federal criminal charges against CW-1. The defendant told CW-1 that she could have faced a significant term of imprisonment as a result of federal criminal charges and that she owed him for his purported efforts on her behalf. Based on the defendant's flirtatious language and demeanor, CW-1 understood that the defendant was requesting sexual favors in exchange for his continued intervention on her behalf with federal authorities.

4. Shortly after CW-1's grand jury testimony, the defendant visited CW-1's house and asked CW-1 to go for a drive with him in his official government vehicle. After CW-1 entered the vehicle with the defendant, the defendant drove a short distance and asked CW-1 to perform oral sex on him. CW-1 complied with the defendant's request. CW-1 subsequently performed oral sex on the defendant and had sexual intercourse with the defendant on multiple occasions, continuing through in or around March 2011. During this period of time, the defendant occasionally reminded CW-1 of his purported intervention with federal authorities on her behalf.

5. On or about January 3, 2013, the defendant met a female cooperating witness (hereinafter "CW-2") who was present during the execution of a search warrant in Rockbridge County, Virginia, related to a federal methamphetamine distribution investigation. CW-2 contacted the defendant by telephone several months later in order to seek his assistance with state authorities who had asked CW-2 to cooperate with an ongoing narcotics investigation in the area. The defendant agreed to contact state authorities, and falsely informed CW-2 by telephone several days later that he had spoken on her behalf to a federal prosecutor and had ensured that she would not be charged with any federal crimes as a result of her presence during the execution of the January 2013 search warrant. The defendant told CW-2 that she could have faced a significant term of imprisonment as a result of federal criminal charges and that she owed him a favor for his purported efforts on her behalf. Based on the defendant's flirtatious language and demeanor, CW-2 understood that the defendant was requesting a sexual favor in exchange for his purported intervention on her behalf with the federal prosecutor.

6. During his telephone voice and text message conversations with CW-2, the defendant requested that CW-2 send him revealing photographs of herself, and CW-2 complied. Shortly after the conversation in which the defendant told CW-2 that she owed him a favor, the defendant arranged to pick CW-2 up at her mother's house in order to transport her to a meeting with state authorities. After the defendant picked up CW-2 and began driving, however, the defendant told CW-2 that he was unable to arrange a meeting with state authorities and instead drove for approximately fifteen minutes to a gravel road, where the defendant parked his vehicle. The defendant reminded CW-2 that he had saved her from federal prosecution and that she owed him a favor. CW-2 responded that she would not have sex with the defendant, and the defendant

replied that oral sex would be fine. CW-2 complied and performed oral sex on the defendant in his vehicle. The defendant then returned CW-2 to her mother's house.

7. Beginning no later than in or around April 2014, and continuing until in or around September 2014, the defendant communicated via cellular telephone calls and text messages with a female cooperating witness (hereinafter "CW-3") who was assisting an ongoing federal criminal investigation into methamphetamine distribution. During these text conversations the defendant informed CW-3 that he was in a position to help her with her case. Furthermore, in or around August 2014, the defendant made clear to CW-3 that, in exchange for sexual favors provided by CW-3, the defendant would make a favorable sentencing recommendation on CW-3's behalf to the Assistant United States Attorney handling CW-3's case. CW-3 pleaded guilty in September 2014 pursuant to a plea and cooperation agreement and her sentencing hearing was scheduled to take place in December 2014.

8. On or about June 6, 2014, CW-3 texted that she was worried about having the possibility of "40 years & two 1 million $ fines over my head" and the defendant responded "[w]ell don't worry about that I will do all I can to help you out with that." The defendant also encouraged CW-3 by saying "Yes you stay on the right track because believe it or not you have a lot going for you. You being drug free is awesome girl and I'm very proud of you."

9. The defendant became more personal with CW-3 and, on or about June 8, 2014, texted CW-3, "Behave yourself and I will see you then lol," to which CW-3 responded, "K lol I will." The defendant then responded: "Yeah I bet. Lol . . . wild than. Lol. . . Thang. . . Just kidding with you. You have been a good girl."

10. Later that month, the defendant progressively used more suggestive innuendo with CW-3. For instance, on or about June 26, 2014, the defendant texted CW-3, "I'm going to

take care of you as long as you take care of me." In turn, CW-3 responded, "I appreciate it and I will do whatever u need me to do so don't worry bout [sic] that!" The defendant responded, "That's what I'm talking about girl. Lol." Later that day, the defendant texted CW-3, "You need to release some stress." CW-3 responded, "...yea I most definitely need to release some stress lol . . . just not sure how to do it I'd like to know." The defendant then texted, "Oh I bet . . . You can figure out something I know. Lol."

11. On or about June 28, 2014, CW-3 and the defendant discussed CW-3's difficulties in finding a job because of her criminal record. The defendant texted CW-3, "Well everyone makes a mistake in their life because no one is perfect. So they should not hold that against you. Like I said take care of me and I will do what I can for you."

12. On or about August 8, 2014, the defendant informed CW-3 that "you are a good girl . . . I'm going to do all I can for you." CW-3 responded, "Thank you I'm very grateful." In turn, the defendant responded, "You owe me. Lol." Later that day, the defendant reminded CW-3, "Hey don't you forget about me because you owe me. Lol." The texting continued for the next few days and the defendant texted CW-3 that they needed to "meet about what you are going to do for me. Lol."

13. On or about August 14, 2014, the defendant and CW-3 discussed by text message places where they could meet on the following day. The defendant pressed CW-3 to choose a meeting place, to which CW-3 responded, "But you're the boss lmao." The defendant replied, "Lmao. Oh no I'm not . . . I will be the boss when we meet. Lol." However, CW-3 backed out of the meeting because she was scared.

14. On or about August 15, 2014, the defendant texted CW-3, "Ok what happened. I spoke up for you today." CW-3 texted that she was too busy to meet because her mother was out

of town. The defendant responded, "Just trying to look out for you like I said I would." CW-3 then texted, "Thank you and I won't forget about ya promise k [sic] sorry again about today" and asked, "[s]o do u know any of my fate yet like how bad it's gonna be lol." The defendant responded, "I'm still trying to do my best, Dont [sic] know for sure yet." He added, "You better make it up to me. Lol." After CW-3 apologized again, the defendant texted, "You better make it up big time."

15. On or about August 16, 2014, the defendant again texted, "You owe me a real good one tho," and CW-3 responded, "Yes I know." CW-3 subsequently texted that she was feeling a little anxious, and the defendant replied, "You should." He then reminded her, "Yeah I will recommend what I think you should get and then the us attorney and you [sic] attorney will get together and present what they think to the judge." He further texted, "I'm talking a lot for you tho [sic]," referring to talking to the Assistant United States Attorney, and "[y]ou have a real good attorney and I'm going to help you out as much as I can." CW-3 thanked the defendant for helping her and the defendant responded, "I told you I will do what I can but you have to work with me girl." She replied, "I will," to which the defendant responded "When when when when. !!!!!!!!. Lol." Later that evening, CW-3 messaged the defendant, "Well I actually find it a lot hard [sic] to believe so much so that I've questioned myself this whole time wondering if we're on the same page as to what ur wanting. . . am I on the right path or completely lost." The defendant responded, "You are right on track."

16. On or about August 17, 2014, CW-3 indicated via text message that she was worried about meeting with the defendant. The defendant responded, "Well if you are worried we won't do it. . . . It will be real good. Lol. . . . I don't see any problems. I see it being all good. Lol." CW-3 replied, "Ok if ur sure but I just find it very hard to believe ud b interested in me."

The defendant then stated via text message, "Oh no I will show you. . . . You have nothing to worry about. I promise. . . . I promise you it will be all good. Lol. I mean all good." CW-3 then informed the defendant, "I am shy when it comes to certain things at first lol." The defendant responded, "Dont be. . . . I'm serious. . . . I will be easy on you if you want me too [sic]." When CW-3 replied, "Lol I guess we'll find out how I want it Lmao," the defendant told CW-3, "That's true u just let me know. Lol. . . . I'm serious and I will do it."

17. Later during the conversation on or about August 17, 2014, the defendant reminded CW-3 via text message, "You need to impress me tho [sic]. Lol." CW-3 asked, "Well what would impress you?" and the defendant responded, "A whole lot. Lol." CW-3 asked, "Like?" and the defendant responded, "Everything. Lol." CW-3 then responded, "That doesn't tell me much lmao….u just gonna leave me in the dark." The defendant replied, "U know girl. Everything! !!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" CW-3 responded, "Well now that explains more." The defendant replied, "You should know. I want it all," then, "[d]on't bring half of it I want it all. Lol."

18. On or about August 20, 2014, the defendant directed CW-3 to find a place to meet the following day because the defendant did not know the area. CW-3 suggested a Quality Inn in Hillsville, Virginia, and provided the defendant with some details about its location. The defendant responded, "I'm licking my chops now. Lol." CW-3 and the defendant discussed the price of the room, but the defendant said that he did not "want to spend that much for a couple of hours." CW-3 offered and was able to use her hotel points for the room and made a reservation. CW-3 texted the defendant at 10:47 p.m. that night stating she had reserved a room. During this text conversation, they agreed to meet at 11:30 a.m. the next day.

19. On or about August 21, 2014, CW-3 texted the defendant that she was nervous and scared and the defendant suggested they "just meet somewhere and talk about some things until you get over your fear." That day, at approximately noon, CW-3 met the defendant at a McDonald's fast food restaurant in Hillsville, Virginia. CW-3 entered the passenger side of the defendant's government vehicle, and the defendant then drove approximately six miles to the back parking lot of a BP gas station in Fancy Gap, Virginia. After parking the vehicle, the defendant began kissing CW-3, after which CW-3 performed oral sex on the defendant. The defendant then drove CW-3 back to the McDonald's, where they parted ways. CW-3 later described the defendant's demeanor during this encounter as aggressive but not physically forceful.

20. On or about September 25, 2014, a search warrant was executed on Verizon Wireless for data relating to the cellular telephone used by the defendant to converse with CW-3. Subscriber information showed that the number was assigned to the Drug Enforcement Administration. Text message logs, which show the times and dates of incoming and outgoing text messages, as well as the phone numbers of the sending and receiving parties, were also obtained with the warrant. All of the text messages between CW-3 and the defendant that were obtained from the forensic examination of CW-3's phone also appear on the text message logs associated with the defendant's phone number.

21. Video surveillance footage for August 21, 2014, was obtained from the McDonald's in Hillsville, Virginia, where CW-3 and the defendant met. The video surveillance obtained from the McDonald's shows the defendant's government vehicle pulling into a parking space there at approximately 11:24 a.m. on that day. According to the text messages from CW-3's phone, the defendant texted CW-3, "I'm here," at 11:25 a.m. The defendant's vehicle

remained parked there for approximately eleven minutes, then pulled out of the space and left the area within the view of the McDonald's surveillance equipment at approximately 11:35 a.m. The surveillance video shows that, at approximately 11:43 a.m., the defendant's government vehicle drove toward the gravel parking lot across from McDonald's. Between 11:25 a.m. and 12:07 p.m., the defendant and CW-3 exchanged several text messages about where CW-3 was located. At 12:07 p.m., CW-3 texted that she was close and asked what kind of vehicle the defendant was driving. He responded with a description of his government vehicle. The McDonald's surveillance video shows CW-3's car entering the parking lot at approximately 12:09 p.m., circling around, then parking in a space in the lot at approximately 12:10 p.m. At 12:10 p.m., the defendant texted CW-3, "I'm over here in the gravel lot." The surveillance footage from the McDonald's shows that, approximately thirty seconds after CW-3's car parks in a space, the car pulled out of that parking space and drove toward the gravel lot to an area out of view of the camera. The surveillance video shows the defendant's government vehicle leaving the area at approximately 12:12 p.m.

22. Video surveillance footage for August 21, 2014, was also obtained from the BP gas station located in Fancy Gap, Virginia, approximately six miles from the McDonald's where CW-3 and the defendant met. This footage shows that the defendant's government vehicle entered the north entrance to the station and drove toward the station's back parking lot at approximately 12:20 p.m.

23. The McDonald's surveillance video shows that the defendant's vehicle entered the McDonald's parking lot and drove toward the gravel lot and then out of view at approximately 12:48 p.m. The defendant's vehicle can be seen leaving the area at approximately 12:50 p.m., and CW-3's vehicle can be seen leaving the area at 12:51 p.m.

24. At approximately 1:57 p.m. on August 21, 2014, the defendant contacted via text message and telephone the Assistant United States Attorney responsible for the prosecution of CW-3. During this conversation, the defendant informed the prosecutor that CW-3 was assisting in the investigation of an individual believed to be involved in the distribution of significant quantities of methamphetamine.

25. Records obtained from Choice Hotels International, Inc., confirm that CW-3 used her Choice Privileges points to reserve a room at the Quality Inn in Hillsville, Virginia, for August 21, 2014, and later cancelled that reservation.

26. On or about September 5, 2014, the defendant and CW-3 exchanged text messages discussing her sentencing. The defendant messaged CW-3 that the Assistant United States Attorney handling CW-3's case had already "knocked a lot of the drug weight off" and added, "Also you will get consideration for the st iffy [sic] you have already done and more for whatever else you are able to do." On or about September 30, 2014, the defendant contacted CW-3 via text message and asked her how she was doing. CW-3 responded that she was concerned about her upcoming sentencing. The defendant replied, "No I haven't forgot about you. You will receive your credit at the sentencing hearing. So you will get that then. I'm trying all I can for you."

27. The acts taken by the defendant, in furtherance of the offenses charged in this case, including the acts described above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

28. This Statement of Facts includes those facts necessary to support the Plea Agreement between the defendant and the government. It does not include each and every fact

known to the defendant or to the government, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

                                      Respectfully submitted,
                                      Jack Smith
                                      Chief, Public Integrity Section

By:                                  _____
                                      Charles R. Walsh
                                      Robert J. Heberle
                                      Trial Attorneys
                                      Public Integrity Section, Criminal Division
                                      United States Department of Justice

**Defendant's Signature**: After consulting with my attorney, and pursuant to the Plea Agreement entered into this day between myself and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 12/16/2014    By: _____
                        Defendant Kevin C. Moore


**Defense Counsel Signature**: I am counsel for the defendant in this case. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: 12/16/2014    By: _____
                        Thomas J. Bondurant Jr.
                        Counsel for Defendant Kevin C. Moore